We'll call our second case of this afternoon. Scott v PNC Bank number 18-3363. Mr. Perkins, and you're going to have to tell me how to pronounce Mr. Contal. May it please the court. My name is Kenneth Perkins and I represent the appellant in this case, Lori Scott. And if I may, I'd like to reserve five minutes of rebuttal time. That's fine. Tell me a little bit about Mr. Scott. What was what did he do for his professional life? Looks like he was involved with various businesses, but Mr. Scott had several successful businesses in the Raleigh, North Carolina area. And in fact, sold a couple of those businesses in 2012 for a significant amount of money. He then retained one of those businesses, which is the subject of the PNC loans in 2017. Let's go back to the beginning. When he was involved with Marathon Holdings, what kind of business was that? Marathon Holdings was a company that owned an aircraft and its only asset was the ownership of an aircraft. And there were actually a couple of aircrafts. And going back to the original loan in 2004, that loan got paid off to RBC Centura Bank. The loan in 04, because the loan got paid off in 04. When was the loan made from RBC Centura? 2004, 2000, 2003, 2004. But he gave an assignment of life insurance in 03, right? Yes. You know, at the time that that loan was made, the assignment of life insurance was a requirement. So you mean he gave the assignment of life insurance and then got a loan? No, no, no. It was a condition of the loan. So this was probably a loan to buy the plane. This is probably paper on a private aircraft. Correct. And so they wanted, I used to call it when I did this, key man life insurance. Is that what they wanted? Well, it wasn't exactly key man life insurance. It's analogous to that. This is an assignment. It becomes collateral. The policy becomes, quote unquote, collateral as a condition of the loan. If the plane went down, they had a life insurance policy. Exactly. Bottom line. How much was the loan? That particular loan, I'm going to have to speculate here, but I'm going to guess it was somewhere in the million dollar range. OK. And then the loan was paid off in 04? Yes. And the assignment of life insurance says that it will continue on for any existing and hereafter arising in the ordinary course of business loans between any one of the combination or of the undersigned and the assignee.  So I assume it's any dealings between Scott and RBC. Is that correct? Well, the problem is, is that the the assignee in that fine print, which is difficult to read, includes successor interest. Well, if you if you read if you read the defined terms, liability is one of the defined terms. Undersigned PNC's argument here is that it's a successor to obviously it's a successor to this assignment. And you're saying I'm saying that it's a dead assignment because that it it lacks consideration as to PNC Bank. The PNC Bank had no knowledge of it. They did not require it in any of its of any of their dealings with Mr. Scott in 2016, 17, 17. And it's ineffective. Now, the word that the district court used and the word that PNC Bank, which is authentic. Yeah. Hang on. Let's just if I can just get some facts, I'm missing some. The loan in 17 was for AccuDoc. That's one of Mr. Scott's wholly owned companies, a wholly owned company. And was. Do you did you look at the loan documents in that case? I have. There might be a loan agreement. There's probably a note. Correct. What collateral was there for that five hundred thousand dollar loan? The assets of AccuDoc solutions and Mr. Scott's personal guarantee. So the documents say that he gave a personal guarantee. And he gave AccuDoc. Receivables, UCC one filing, etc. Was the assignment of life insurance mentioned in the loan documents? No. OK. You don't allege all that in your complaint, do you? Yes, I do. I believe I indicate that at this stage, see, the key to this is at this stage of the proceeding, the plaintiff gets a chance to prove this. What do you want us to do? I'm really confused. What do you want us to do? You claim I want you to send it back to the district court and tell the district court that the plaintiff gets a chance to prove the allegations of the complaint. But what are the allegations? What are the allegations? What did you what did your allegations are? The PNC Bank knew that this assignment was ineffective when it finally got presented the assignment in 2017. It had no knowledge of it. There was no consideration to PNC Bank for it. It was an ineffective assignment going back to 2004. The damages to your client. What are the damages? Well, the damages are that PNC held up the proceeds for a number of months. OK. Five, six months. Right. And proceeded with negotiations with my client knowing that it didn't have any right to this policy. But but what are the damages? Quantify that. Let's assume you're right. What are the damages? Well, you've got you've got emotional distress damages. The woman's just lost her husband. She's trying to keep things together in an estate. You've got a bank using, you know, it's workout people. This this court's experience and knows how banks use heavy handed tech techniques and workout situations. Why would this be a workout situation when there was not a default? Well, a default is the death of the guarantor. That with the loan documents. Yes. Now, when usually when a loan document says that a default is the death of the guarantor, oftentimes that's over. Courts look past because most banks don't try to enforce that because they know if they try to enforce, it's going to be a major problem. So that that's the only quote using air quotes default. There were no other defaults in the loan at that point in time. And the. At the there was a settlement that was entered into, well, back and forth with the emails and discussions on January 31st. Correct. Of of 18. And thereafter, you say that the subordination that was agreed to on January 31st wasn't the subordination that the bank put into the document. And then when they corrected that, they asked for a release. But in both cases, the bank ultimately. Caved that they did after after I sent the bank a draft of a complaint. Look, I I've represented clients for. But I'm just trying to get the facts. I don't sue banks. OK, I've represented clients in hundreds and hundreds of transactions, and I've represented banks in hundreds and hundreds of transactions. And I would submit to this panel that PNC's tactics in this case didn't just cross an ethical line, they crossed legal lines. And that's why this plaintiff has sued out a three count complaint for what it is about working backwards. Banks often may ask for more. But I'm just just dealing with a settlement agreement. Let's forget the loan for the moment. You think you've agreed on X and they ask for and they send you something that gives them just a little more than what you thought they were entitled to by way of the subordination. You object and then they send you something that says, OK, we'll agree on that, but now give us a release. And you say that's not part of the deal. They cave on that. How can there possibly be any damages during that? Turns out to be nine day period from January 31st of February nine. If you take the entire course of conduct from remember, I'm asking you just to deal with those nine days. Well, it strikes me that if the plaintiff in this situation performed exactly in accordance with the agreement and then gets some consistent improper, we'll call it illegal, continuing conduct in which the bank is trying to extract every pound of flesh that it can. This is a course of no, I get it. But what is the course of conduct that's reprehensible? Let's assume you're right. They crossed the line. But what are the damages for those nine days? Well, for those nine days, obviously, there's nominal damages for those nine days. I'll concede that to the court. That's the right answer. I mean, let me ask you, Mr. Perkins, on your conversion claim. Yes. And I'm I've struggled with why you brought a conversion claim and not a tortious interference with contract claim. But you brought a conversion claim. So that's what we have in front of us here. It seems to me that under Pennsylvania law and you agree, Pennsylvania law controls here, correct? I believe that's correct. OK, that in order to have conversion, the person who has their property converted had to have the right to immediate possession. I disagree with that interpretation. Well, why do you disagree? That's that's that's why you disagree with that. Let me give you a little procedural history on that point that I think will clarify it. The PNC Bank's brief suggested that by citing a case called Chrysler Credit. And that brief said that there had to be an immediate right to possession. That's not what Chrysler Credit holds. But the district court bought that brief hook, line and sinker and cited it almost verbatim in its memorandum opinion. But if you read Chrysler Credit carefully, there are a number of oars in Chrysler Credit. And those oars are specifically. Deprives plaintiff of a right to a chattel or interferes with plaintiff's use or possession. In other words, it's not there are three oars in Chrysler Credit, which are an accurate statement of conversion law in Pennsylvania, not just an immediate right to possession. That's only one of the oars. All right. What about what about the case of Pittsburgh Construction Company versus Griffith of 2003? Pennsylvania Superior Court case that says that you don't have the immediate right to possession of insurance proceeds. What kind of insurance proceeds? None of those cases deal with life insurance proceeds. The those cases all deal with auto insurance and other insurance. That's the other thing. The question is here. The question is here. Take PNC's conduct out of this for a second, and I know you can't. But the question is here, your client, beneficiary of that insurance policy. Her husband dies. Trans-American has the insurance policy. She makes a claim through her counsel for a million dollars. OK. The reason in this case she didn't get the million dollars is because of this assignment. There are all kinds of other reasons why an insurance company might say, well, I'm not going to respond, I'm not going to send you a million dollar check in return mail. We want to check out point A, point B, condition C, condition D of the insurance policy before we send anything. So until all those conditions are met, she doesn't have an immediate right of possession. If everything's met, there's a debt owed from that insurance company to Mrs. Scott. Isn't this the underlying theory that in Pennsylvania you don't have a action and conversion you have a contract action against the insurance company? I would respectfully suggest to the court that fixation on immediate right to possession is not the law of conversion in Pennsylvania. There are ors in the law of conversion in Pennsylvania, and it isn't just immediate right. And if you take a careful look at the cases that involve insurance, you'll see that they are not life insurance. This is not a lawsuit against Trans-America for failing to pay. Okay, this is a lawsuit against a third party for getting in the way of that. But why isn't this tortious interference? I mean, I'm not trying to make your case for you, but it sounds to me like this is tortious interference. You send it back to the district court and we'll amend. You didn't ask for that. You've never asked for that. Well, we have a bad faith claim, which is tantamount to that. We also have a fraud claim. You have to have an underlying contract claim to recover under a bad faith claim. And we've pled that. All of the elements of every... For which you have nine days of damages. Well, all of the elements of each of the causes of action are properly pled, and the district court took away from the plaintiff the right to prove those things. This case is not a difficult case on procedure. Rule 12D says that the moment that that assignment gets attached to a response in this case, the plaintiff gets a chance to rebut it. That was taken away from the plaintiff here. That's a good segue, I think, hearing from your opposing counsel. Thank you, Your Honor. We'll get you back in rebuttal. Thank you. Good afternoon. May it please the court. My name is Brian Willett from Reed Smith. On behalf of the apple age... Oh, sorry. I had to hear something else. Justin Contal was originally scheduled to argue this. I'm sorry. Your name is again? Brian Willett. Willett. Okay. Okay. Let me ask you this. For the 2017 loan, is Mr. Perkins correct that the collateral were the assets of AccuDoc and a guarantee by Mr. Scott? Your Honor, I am not quite sure of that, but I would submit that... Do you have the loan binder with you? I do not have it with me. But I would submit that that doesn't really matter here, because the original assignment said that it was secured by... Well, the original assignment was with another bank. And the question I guess I have is, how did the assignment of life insurance that was entered into in 2003 become known to PNC in 2017? Well, I think this goes back to what Judge Fischer is pointing out, is that it was actually Transamerica who pointed out that PNC had the... But when was that? That was in 2017, in August 2017, when... Mr. Scott died. When the claim was made. So when the loan was made in March of 17, PNC didn't know about the assignment of life insurance policy. I don't know that that is true, Your Honor. I'm just trying to, from a time point of view, if you first found out about it when Transamerica noted that there was an assignment of life insurance in August or sometime thereafter Mr. Scott's death, then it would appear that no one knew about this other than Transamerica in the few months before when the loan for half a million dollars was made. Is that correct? Well, I don't believe that that is the case. You don't believe what is the case? That PNC was not aware of it until it was informed by Transamerica. You just answered my question before, when did it come to the fore that there was an assignment of life insurance policy and you said it happened shortly after Mr. Scott's death, right? That PNC had the knowledge, Your Honor? Well, anyone had the knowledge because it wasn't noted. In other words, if I'm making a loan to you in March of 2017 and I know about the assignment of life insurance policy, I would say, okay, we're making you, here's the note for $500,000 and the collateral are, one, assets of ACUDOC, two, Scott's guarantee, because that brings in, three, the assignment of life insurance policy on Scott's life. Yes, Your Honor. Okay, but you're saying that the loan docs in March of 2017 did not include, to your knowledge, the assignment of life insurance? Well, I hesitate to continue saying I don't know, but that was not alleged in the complaint. I understand that, but what's alleged in the complaint, now we'll go back to paragraph seven of the complaint, says that when the loan was paid off in 2004, there should have been a cessation of the life insurance assignment, and your response to that is, whoa, whoa, whoa, hang on. There's a second document that accompanies the assignment of life insurance. It's called the assignment of life insurance policy as collateral, and that accompanies the form in 2003, and that assignment of life insurance policy as collateral says, this assignment is made and the policy is to be held as collateral security for any and all liabilities of Harry W. Scott, Jr. and Marathon Holdings to the S&E, which was RBC Centura. So he's a North Carolina person, and this is a North Carolina bank, RBC Centura. Both those now existing and those that may hereafter arise in the ordinary course of business between anyone or any combination of the undersigned and the S&E. So I'm not quite sure what that means, but I guess it means that in the ordinary course of business between Scott and RBC. Yes, Your Honor. Okay. And so it doesn't, your point is, it doesn't, the typical case would be, yeah, you got to give a notice to Transamerica in 2004 that this loan's been paid off, but not here because you have this additional document that has the language I just read. Yes, Your Honor. My response would also be in paragraph seven of the complaint. It is alleged that. Paragraph what? Paragraph seven. I'm sorry, Your Honor. That the assignment was never canceled. Was never what? Was never canceled, and then again in paragraph 12, there's a concession that the assignment was still in place. But then the question becomes, what is the ordinary course? I don't know the answer to that question. And is the ordinary course future dealings between RBC and Scott? Well, maybe. But it turns out there are no future dealings between RBC and Scott in 05, 06, 07. All the way through the time that RBC Centura ceases to exist and is sold to PNC in 2012. So let's assume Mr. Scott lived to be 107 instead of dying in 2017. Are you saying that this assignment of life insurance exists in perpetuity until this man dies at 107? Yes, Your Honor, I would because PNC acquired. Excuse me, Your Honor. That can't be. Well, PNC acquired RBC Centura and the assignment was still effective. And it really doesn't matter as much what PNC's belief was because Transamerica was holding the proceeds. But the point is that Transamerica is just a placeholder. Let me interject here. So you get to August 2017 and the estate of Scott contacts PNC. Where is the liability from Mr. Scott to PNC Bank at that point? Well, there were additional loans made in March of 2017. Yeah, what was the loan? What was the loan to Mr. Scott? That was, I believe, about half a million dollars. Yeah, but that was made to a corporation called AccuDoc. Which was only owned by Mr. Scott. That's not a loan to Mr. Scott. That's a loan to Mr. Scott. That's not what the assignment says. Well, I believe the assignment says affiliates of the undersigned. But the point here being, we don't, do you know for sure what this document meant in 2003 when they say that this assignment of life insurance policy will exist hereafter in the ordinary course of business for any dealings in effect between Scott and RBC. What does the ordinary course of business mean? Well, I don't think we're at the stage where we're trying to interpret the meaning of the contract. I would take a step back and just say that even if you don't consider the assignment, there haven't been any causes of action quite here. Well, he's pleading a cause of action that they had a right to something and that the bank, PNC, is claiming that it's holding it up and therefore there's a conversion right or, as Judge Fisher says, if you meant the complaint, maybe there's an interference with the contractual right. Who knows? But the point where I'm heading is if I can't figure out what the ordinary course of business means with regard to a now defunct entity called RBC Centura and Mr. Scott who's now dead, doesn't that mean somehow we've got to interpret that? Or if you're back in the district court, you've got to try to find out through some discovery if there was any writings or anything like that as to how this language was negotiated in 03. Would that be helpful? Well, Your Honor, this issue was never raised by appellant. In paragraph 7 of his complaint, he says that you should have right here. Scott purchased the policy as required by RBC Centura Bank in connection with a loan transaction was it paid off and satisfied in 04, effectively negating the assignment of the policy. So they're saying it was negated in 04. You're saying no, it goes past 04, just look at this language. The question is how long does it go past 04? And don't you need discovery to find out what that is? Well, I would say that that is a conclusionary allegation that's not entitled to the presumption of truth because it's not supported by anything. And I would also say that appellant could have. No, I mean, the assignment of life insurance policy is governed by which state's law, do you think? I would have to check. And you have a North Carolina bank and a North Carolina individual and a document without a choice of law. So, therefore, it would have to be North Carolina, would it not? Yes, Your Honor. And if North Carolina has cases that say that when you pay off the debt, the collateral must be given up in the general case, then, again, you come back and say, well, wait a minute, I've got an agreement that says it goes beyond the general case. But how far beyond before it becomes something that perhaps becomes, lack of a better word, unconscionable? And so there's a lot of hair on this case. And it seems very difficult to try to say that this case can be resolved completely on a motion to dismiss, rather than maybe a summary judgment. Who knows? But Marathon's not involved anymore, the loan from 03. It is a new company. This man was obviously an entrepreneur and seemingly, I guess, successful. And it's a small loan. And it looks like, my guess is, that the first inkling that PNC had that there was an assignment of life insurance policy was in August of 2017, or shortly thereafter, and was never thought of at all with respect to it being part of the collateral for the loan made in March of 2017. Well, Your Honor, I think that's assuming a lot of facts that haven't been pledged in the complaint. No, the complaint pleads you should have let it go in 04, and you're saying no. That cries for discovery, does it not? No, I don't believe it does, respectfully, Your Honor. Why? Because. Because the plaintiff is the master of her complaint. None of this was alleged. The complaint is it ceases. I mean, and there's case law all over the country. I mean, Judge Posner of the Seventh Circuit in another case said, you know, once you pay off the loan or the liability, the collateral just disappears. You have to get rid of it. You have to let it go. And again, you're saying I have a good argument to that. Look at the agreement. And what I'm saying is how do I interpret the agreement? If you're asking me, just me, to interpret that agreement, I think absent you knowing in 2017, March, the PNC knowing at that point that there was an assignment of life insurance policy and agreeing with Mr. Scott that that was collateral to support his guarantee, you've got a problem. And you're telling me it looks like, absent discovery, that the bank didn't know about this until four or five months later when Mr. Scott died. Well, I'm not saying that, Your Honor. I think that is contrary to the facts even as pled. What are you saying? Because as put in the complaint, it was Trans-America's interpretation was that the assignment was still valid. And there's no indication that. No, no, no. Trans-America, they're sitting there collecting premiums on Mr. Scott's life. They've got an assignment. Somebody makes a claim. All they say is, hey, there was an assignment here back in 2003. And that bank, by the way, doesn't exist anymore. It's PNC. Straighten up with them whether or not that assignment is still good or not. And that's all Trans-America was saying. Before we send the check, give us an answer. Yeah, we don't want to. And if you put us in the middle of it, we'll just do an interpleader that says, here it is, court. You decide. And if you're representing Trans-America, your counsel to them is, don't get involved in this. Stay out of it. Well, I think that this line of argument is inserting an expiration date on the assignment that is clearly not there. No, the expiration date is in the ordinary course of business between Scott and RBC. In effect, so far, you're telling me we have to do an interpretation of that. No, I don't, Your Honor. What? I don't think that PNC. If I don't interpret it your way, I mean, whatever I'm doing, it's an interpretation, right? If I go your way. I'm interpreting in the ordinary course of business means perhaps until Mr. Scott dies, whenever that is. That's an interpretation. Just happens to be, under my assumption, an interpretation that favors you, correct? Yes, Your Honor. So I'm saying that there's a possibility that with the Skybird, you might interpret this the other way. That's a possibility, Your Honor. But I think you can take the assignment completely out of this. And there still would not be any causes of action that are adequately pled against PNC. Let's assume that North Carolina law applies to the assignment of life insurance as collateral. And I think everybody here can pretty much agree that that's the case. Then the question is how would North Carolina interpret this particular assignment, this language that says that this assignment continues for all liabilities that exist between Scott and RBC, now defunct, by the way, in the ordinary course of business. And I'm telling you, I simply don't know what that means, necessarily. Well, Your Honor, I still don't think that. But there's got to be an end date, I would think, and it's not death at 107. Well, that is also not what occurred here, Your Honor. What? That also did not occur here. But I gave you the hypothetical that if it did, you're saying it would go on until he's 107, right? Under the claim language as I read it and apparently as the district court read it, that should be the case, Your Honor. But didn't the district court really skip over that and say that there was no immediate right of possession? Yes, Your Honor. Okay, so isn't that really the key here? I mean, on the conversion claim, did in fact Mrs. Scott have the immediate right of possession to those insurance proceeds? No, she did not. Well, opposing counsel, Mr. Perkins, sharply disagrees with you on that. Unsurprisingly, but the district court also cited cases that said insurance proceeds were an inappropriate basis for a conversion. That's usually the case. Mr. Perkins distinguished that. That's usually the case. I have property insurance. Some type of event happens like a hurricane. I go apply for the property insurance. They go, nope, we don't pay it out for this type of event that's in nature. That's an example of that. Well, Your Honor, in the end, as far as the conversion claim is concerned, as alleged in the complaint, appellant received the proceeds in full two months before filing the suit. Two months before what? Before even filing suit here, Your Honor. So I would submit that there is absolutely no basis for a conversion claim. They alleged that they would have done it five months before. Yeah, this was part of the settlement, right? Between January 31 and finally on February 9. The negotiations. Right. I'm not, I don't think we have to get into that. I've told Mr. Perkins I don't think there's much of a claim there. Bank may have, quote, crossed the line, close quote, but they immediately came back across and they settled up. So that's not the issue for me. The issue for me is 2017. If you make a loan, I thought if you'd come to me and you said, in March of 2017, we knew about the assignment of life insurance policy. Scott knew about it as well. We reminded him and it was part of the loan package. Case closed. Mrs. Scott loses. But you're telling me it doesn't look like that was in the loan docs and Mr. Perkins is now saying case closed. Your Honor, respectfully, he did not attach the loan docs. He had the opportunity to do so. And this is kind of putting us in a catch 22 because. Well, you both have access to the loan docs. I mean, if they if they if they aid you, you would put them out if they. So neither side really gave us the loan docs from March of 17. And that's probably what we would do. I mean, I realize that we're beating a dead horse. Is there anything else you want to add? I mean, I'll just submit on all of these causes of action. Your Honor, there are no damages. Emotional distress can't even be recovered for these claims. And I would say thank you. Thank you. How did you get called into this case again? You somebody else was going to argue this case. And when when did you find out you had to argue it? Go back and tell the person. Thank you very little. I've been there. Anything you want to add? Just a couple of points. You sure you want to add anything? I really don't. Thank you, Your Honor. OK.